1  Susan Koehler Sullivan, State Bar No. 156418
   *susan.sullivan@clydeco.us*
2  Patrick R. Emerson, State Bar No. 330610
   *patrick.emerson@clydeco.us*
3  CLYDE & CO US LLP
   355 S. Grand Avenue, Suite 1400
4  Los Angeles, CA  90071
   Telephone:   (213) 358-7600
5  Facsimile:   (213) 358-7650

6  Attorneys for Defendant
   ZURICH AMERICAN INSURANCE COMPANY

7

8              UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10                 SOUTHERN DIVISION

11 PACIFIC PREMIER BANCORP,            Case No. 8:22-cv-00842-CJC-DFMx
   INC. a Delaware corporation, and
12 PACIFIC PREMIER BANK, a            Hon. Cormac J. Carney
   California corporation,            Courtroom 9 B
13
                Plaintiffs,            **DEFENDANT ZURICH AMERICAN
14                                     INSURANCE COMPANY'S
        v.                             MEMORANDUM OF POINTS AND
15                                     AUTHORITIES IN SUPPORT OF
   ZURICH AMERICAN INSURANCE          MOTION TO DISMISS FIRST
16 COMPANY, a New York corporation,   AMENDED COMPLAINT
   and COLUMBIA CASUALTY              (Fed. R. Civ. P. 12(b)(6))**
17 COMPANY, an Illinois corporation,
                                       Date:        September 26, 2022
18              Defendants.            Time:        1:30 p.m.
                                       Courtroom:   9 B
19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**PAGE**

I.  INTRODUCTION .................................................................................................. 5

II.  STATEMENT OF FACTS .................................................................................... 6

    A.  The Hamstreet Litigation ........................................................................... 7

    B.  The Anderson Litigation and Beattie Litigation ....................................... 9

    C.  The Policy ................................................................................................. 10

    D.  Grandpoint Had Lender Liability Coverage but Opted Not to Extend It.

        The Professional Liability Coverage That Grandpoint Purchased Excludes

        Coverage for Lending Acts. .................................................................... 12

III.  LEGAL STANDARDS ...................................................................................... 14

    A.  Federal Rule of Civil Procedure 12(b)(6) .............................................. 14

    B.  Interpretation of Insurance Contracts Under California Law ................... 15

IV.  ARGUMENT ..................................................................................................... 16

    A.  The Lending Act Exclusion Precludes Coverage for the Lawsuits. ......... 16

    B.  The Breach of Contract and Declaratory Relief Claims Fail Because

        There Is No Coverage Under the Policy. ................................................. 22

    C.  There Can Be No "Bad Faith" Because There Is No Coverage. .............. 23

    D.  The First Amended Complaint Should Be Dismissed with Prejudice Because

        Amendment Would Be Futile. ................................................................. 23

V.  CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Adelman v. U.S. Specialty Ins. Co.*
  No. 21-cv-02758-JST, 2021 WL 6427920 (N.D. Cal. Nov. 17, 2021),
  *appeal docketed*, No. 22-15048 (9th Cir. Jan. 12, 2022)........................................17

*AmeriSourceBergen Corp. v. Dialysist W., Inc.*
  465 F.3d 946 (9th Cir. 2006)..................................................................24

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) .........................................................................15

*Bank of Camilla v. St. Paul Mercury Ins. Co.*
  939 F. Supp. 2d 1299 (M.D. Ga. 2013) ................................................20

*Brown v. Mid-Century Ins. Co.*
  215 Cal. App. 4th 841 (Ct. App. 2013)..................................................23

*Cervantes v. U.S.*
  330 F.3d 1186 (9th Cir. 2003).............................................................15

*Conservation Force v. Salazar*
  646 F.3d 1240 (9th Cir. 2011).........................................................14, 15

*Daniels-Hall v. Nat'l Educ. Ass'n*
  629 F.3d 992 (9th Cir. 2010)..............................................................15

*Franklin v. Midwest Recovery Systems*
  No. 8:18-cv-02085, 2020 WL 3213676 (C.D. Cal. Mar. 9, 2020) ........................16

*Impac Mortg. Holdings Inc. v. Houston Cas. Co.*
  No. SACV 11-1845-JST, 2013 WL 4045362 (C.D. Cal. Feb. 26, 2013).............16

*Intergulf Dev. LLC v. Super. Ct.*
  183 Cal. App. 4th 16 (Ct. App. 2010)...................................................23

*Jamison v. Certain Underwriters at Lloyd's*
  599 Fed. Appx. 720 (9th Cir. 2015).....................................................17

*Jeff Tracy, Inc. v. U.S. Specialty Ins. Co.*

   636 F. Supp. 2d 995 (C.D. Cal. 2009) ....................................................................16

*Love v. Fire Ins. Exch.*

   221 Cal. App. 3d 1136 (Ct. App. 1990)..........................................................22, 23

*Palmer v. Truck Ins. Exch.*

   21 Cal. 4th 1109 (1999) ....................................................................................15

*Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*

   491 F. Supp. 3d 738 (S.D. Cal. 2020)................................................................24

*Poe v. Northwestern Mut. Life Ins. Co.*

   No. CV 21-02065, 2022 WL 2046190 (C.D. Cal. Apr. 20, 2022) ......................22

*RHBT Fin. Corp. v. St. Paul Mercury Ins. Co.*

   No. 0:03-3295-1, 2004 WL 5806112 (D.S.C. Aug. 12, 2004) .............................20

*United Farm Workers of Am. v. Hudson Ins. Co.*

   No. 1:18-cv-0134, 2019 WL 1517568 (S.D. Cal. Apr. 8, 2019) ...........................16

*United Talent Agency, LLC v. Markel Am. Ins. Co.*

   No. 2:21-cv-00369-MCS-E, 2022 WL 599023 (C.D. Cal. Jan. 26, 2022),

   *appeal docketed*, No. 22-55205 (9th Cir. Feb. 28, 2022) ....................................17

*Waller v. Truck Ins. Exch., Inc.*

   11 Cal. 4th 1 (1995)....................................................................................15, 23

*World Health & Educ. Found. v. Carolina Cas. Ins. Co.*

   612 F. Supp. 2d 1089 (N.D. Cal. 2009) ........................................................12, 23

**Statutes**

Cal. Civ. Code § 1638................................................................................15

Cal. Civ. Code § 1646................................................................................15

Fed. R. Civ. P. 12(b)(6) ........................................................................passim

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ("Line of Credit") ..................................7

1   <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2       Defendant Zurich American Insurance Company ("Zurich" or "Defendant")

3   respectfully submits this Memorandum of Points and Authorities in support of its

4   Motion to Dismiss (Fed. R. Civ. P. 12(b)(6)) the First Amended Complaint of

5   Pacific Premier Bancorp, Inc. ("Bancorp") and Pacific Premier Bank (the "Bank,"

6   collectively "Plaintiffs").

7   **I.    INTRODUCTION**

8       Plaintiffs bring this lawsuit seeking defense costs for three underlying

9   lawsuits that Plaintiffs allege Zurich wrongfully denied coverage for (the

10  "Underlying Actions").  The plaintiffs in the Underlying Actions allege that the

11  Bank assisted in the maintenance of a large Ponzi scheme perpetrated by its

12  customer, American Equities, Inc. ("AEI"), by continuing to lend to AEI despite

13  numerous improprieties and/or irregularities.  AEI was in the business of making

14  loans, purchasing, servicing, and selling first position mortgages and trust deeds

15  secured by real estate.  This included soliciting investments for pools of loans ("the

16  Pools") that were supposedly backed by real estate.  However, investor funds in the

17  Pools were improperly siphoned away by AEI's principals and new investor funds

18  were used to "pay" earlier investors.  The Bank was named as a defendant in one

19  lawsuit brought by the general receiver for the Pools and in two other lawsuits

20  brought by investors in the Pools.

21      As demonstrated below, Plaintiffs' lawsuit should be dismissed at the outset

22  because the Underlying Actions are plainly excluded under the Zurich Policy's

23  "Lending Act" exclusion (the "Lending Act Exclusion").  Not only did the company

24  to whom Zurich issued the Policy—to which Plaintiffs are the alleged corporate

25  successor—— *fail* to purchase coverage for lending acts in the first instance, but the

26  Lending Act Exclusion expressly applies to any claim for a "Wrongful Act … in

27  connection with a Lending Act."  Here, the allegations against the Bank in the

28  Underlying Actions are entirely *in connection with* (and indeed depend upon) the

Bank's "Lending Acts"—as broadly defined in the policy.  The Bank's lending relationship with AEI forms the entire basis for the underlying plaintiffs' claims against it.  The Receiver and the investors all allege that the Bank's conduct in *continuing to lend to AEI* until it was able to pass off the lending relationship to another banking institution was essential and instrumental to AEI's continued perpetration of a Ponzi scheme, and resulting damages to the underlying plaintiffs.

A simple comparison of the Policy to the allegations in the Underlying Actions demonstrates that the Underlying Actions fall squarely within the Lending Act Exclusion.  As no coverage is afforded by the Policy as a matter of law, Plaintiffs cannot state a plausible claim for breach of contract, "bad faith," or declaratory relief.  Moreover, since there is no indication that Plaintiffs could ever cure these defects, the First Amended Complaint should be dismissed *with prejudice*.

## II.  STATEMENT OF FACTS

Plaintiffs allege that Zurich's policy provides coverage for the following Underlying Actions, identified as follows in Plaintiffs' First Amended Complaint:

(1) *Clyde A. Hamstreet & Associates, LLC v. American Equities, Inc., et al.,* No. 20-2-00507-06, Superior Court of Washington, Clark County (the "Hamstreet Litigation");

(2) *Diane Anderson, et al. v. Davis Wright Tremaine LLP, et al.,* No. 3:20-cv-01194-AC, United States District Court for the District of Oregon (the "Anderson Litigation"); and

(3) *Beattie, et al. v. Davis Wright Tremaine LLP, et al.,* No. 20CV09419, Circuit Court of the State of Oregon, County of Multnomah (the "Beattie Litigation," collectively the "Lawsuits").  First Amended Complaint ("FAC") ¶ 1, ECF No. 16.  Plaintiffs seek defense costs that they have allegedly incurred defending the Lawsuits.  *Id.* at ¶ 38.

A.    **The Hamstreet Litigation**

In the operative Second Amended Complaint in the Hamstreet Litigation, Plaintiff, who is the general receiver (the "Receiver") for 15 Washington limited liability companies (i.e. the Pools), alleges that beginning in 2002 Defendants including AEI, American Eagle Mortgage Management, LLC, Ross Miles, and Maureen Wile (collectively "AEI Defendants") established the Pools, but then used the Pools as part of a "Ponzi scheme." FAC Ex. 1, ¶¶ 1, 5, 7, 11. This resulted in the Pools suffering losses and ultimately becoming insolvent. *Id.* at ¶ 31.

The Receiver alleges that AEI Defendants solicited investments in each Pool for a specified period and rate of return on real estate investments, that AEI Defendants made promises to investors in relation to the Pools, and that AEI Defendants managed the Pools. *Id.* at ¶¶ 11-12, 15, 28. AEI Defendants then allegedly "routinely made unauthorized, undocumented, undisclosed and irregular transactions involving the Pools' assets," which included "intermingling and comingling of funds among the Pools, millions of dollars in loans among the Pools," and millions of dollars in additional loans to third parties connected to AEI Defendants (most of which have not been repaid). *Id.* at ¶ 27. AEI Defendants also allegedly engaged in self-dealing, such as lending to family members and using Pool assets as collateral for loans. *Id.* at ¶¶ 27-28, 31. The Pools operated as a "unitary enterprise" where cash and assets were commingled and moved from one Pool to another. *Id.* at ¶ 28. The Pools have allegedly been functionally insolvent since at least 2007. *Id.* at ¶ 31.

Regarding Plaintiffs, the Receiver alleges that the Bank "and its predecessors in interest Regents Bank and Grandpoint Bank" provided lines of credit[1] to AEI Defendants and had a "lending relationship" with AEI between 2008 and 2015. *Id.*

---

[1] A line of credit is: "The maximum amount of borrowing power extended to a borrower by a given lender, to be drawn on by the borrower as needed." BLACK'S LAW DICTIONARY (11th ed. 2019) ("Line of Credit").

at ¶¶ 7, 58-59.  The Receiver alleges that the Bank's conduct in providing credit to AEI Defendants during this period was required for the Ponzi scheme to operate and furthermore to conceal its true nature.  *Id.* at ¶¶ 7, 58.  The Receiver alleges "Pacific Premier Bank … provided credit to AEI Defendants that allowed AEI Defendants to operate and conceal a Ponzi scheme," and that the "Pacific Premier [line of credit] was an essential part of AEI Defendants' misuse of Pool assets" and "an essential component to the continuation of the Ponzi scheme."  *Id.* at ¶¶ 7, 63, 84.  The Receiver further alleges: "Without the Bank lines of credit to buffer periods when new investor money was not sufficient to make interest payments and distributions … AEI's insolvency would have been obvious … at least as early as 2007."  *Id.* at ¶ 32.  The Bank's conduct also allegedly allowed AEI Defendants to deepen the Pools' debt, and to receive the benefits of fraudulent transactions.  *Id.* at ¶ 81.

The Receiver asserts that the Bank "knowingly provided substantial assistance to [Defendants] in their breaches of fiduciary duties to the Pools and breached its own independently-owed duties."  *Id.* at ¶ 84.  The Receiver's specific allegations regarding the Bank's involvement in the alleged Ponzi scheme include that:

- In 2008, AEI provided financial statements to the Bank that showed AEI Defendants' improper borrowing from the Pools.  *Id.* at ¶ 61.

- In 2011, the Bank allegedly provided loans to AEI Defendants despite being aware of their "precarious financial position."  *Id.* at ¶ 59.

- In 2012, the Bank allegedly backed off requiring "industry standard appraisals" to provide credit to AEI Defendants, after AEI owner Ross Miles threatened to remove his business.  *Id.* at ¶ 62.  The Bank then renewed a "guidance" line of credit without changing the appraisals.  *Id.*

- In 2014, at least five of the Bank employees allegedly signed-off on renewing the line of credit while noting that the Pools' revenue had shifted heavily from real estate contract sales to broker fees.  *Id.* at ¶ 76.  In the process, they noted

Miles's longstanding relationship with the Bank's founder, Thomas Young. *Id.* at ¶ 77.

- In 2015, the Bank noted inadequate in-house accounting by AEI Defendants, while also noting that Miles had referred clients to the Bank. *Id.* at ¶ 78. The Bank did not renew the line of credit at this time but did grant extensions on maturing loans before passing the loans to a financing company associated with Young. *Id.* at ¶ 79.

The Receiver more generally alleges that the Bank allowed AEI Defendants to "freely" use the line of credit for cash advances. *Id.* at ¶ 63. Further, the Bank allegedly provided credit directly to Miles, including expressly for business purposes, which continued until 2018. *Id.* at ¶ 80. The Receiver also details specific instances of loan arrangements between the Bank and AEI Defendants. *See generally id.* at ¶¶ 64-72.

Based on the above allegations detailing various aspects of the lending relationship between AEI Defendants and the Bank, the Receiver asserts causes of action against the Bank for breach of fiduciary duties, aiding and abetting breach of fiduciary duties, and negligence. *Id.* at ¶¶ 87-90, 93-94.

**B.    The Anderson Litigation and Beattie Litigation**

The Anderson Litigation and Beattie Litigation involve allegations by *investors* in the Pools against AEI Defendants. FAC Ex. 2, ¶ 2; FAC Ex. 3, ¶ 1. The operative Second Amended Complaint in the Anderson Litigation and the Second Amended Complaint in the Beattie Litigation include additional allegations against AEI Defendants, including that they lacked necessary state and federal licenses and registrations. FAC Ex. 2, ¶¶ 23, 31, 34-41; FAC Ex. 3, ¶¶ 29, 37, 40-47. These Complaints also include allegations against AEI Defendants' legal counsel. FAC Ex. 2, ¶ 2; FAC Ex. 3, ¶ 1.

Regarding the Bank, however, the allegations in the Anderson Litigation and Beattie Litigation track those in the Hamstreet Litigation. *See generally* FAC Ex. 2

1  (Anderson), ¶¶ 44-65; FAC Ex. 3 (Beattie), ¶¶ 52-75; *cf.* FAC Ex. 1 (Hamstreet), ¶¶

2  57-84.  Additionally, the Anderson and Beattie plaintiffs allege that the Bank

3  supported Defendants' unlawful sales of securities to Plaintiffs and unlawful

4  operation of a securities business "[b]y providing credit advances of necessary

5  funding secured by receivable contracts taken from the [Pools]."  FAC Ex. 2, ¶ 65;

6  FAC Ex. 3, ¶ 75.

7       Plaintiffs in the Anderson Litigation assert two causes of action against the

8  Bank for violations of the Oregon Securities Law.  FAC Ex. 2, ¶¶ 73-80; 86-91.

9  Plaintiffs in the Beattie Litigation likewise assert two causes of action against the

10  Bank for violations of the Oregon Securities Law, and one cause of action for

11  violations of the Oklahoma Uniform Securities Act.  FAC Ex. 3, ¶¶ 83-90; 96-101;

12  107-112.  As with the Hamstreet Litigation, the Anderson and Beattie plaintiffs

13  allege that the Bank's liability stems from its lending relationship with AEI.

14       **C.     The Policy**

15       Zurich issued Financial Institutions Select Insurance Policy No. MPL DOP

16  0115355 02 (the "Policy") to Grandpoint (not the Bank or Bancorp) for the policy

17  period April 30, 2017 to July 30, 2018 (as amended by Endorsement No. 15).  FAC

18  Ex. 4, pp. 8, 85.  As an initial matter, the Policy does not provide that Zurich has any

19  "duty to defend" lawsuits, and Zurich cannot be found in breach of a "duty to

20  defend" as none exists.  Rather, the Policy provides that the insured is required to

21  undertake its own defense, as follows:

22

23

24

25

26

27

| Item 8. | Defense: | | |
|---|---|---|---|
| A. | Management Liability Coverage Part: | | |
| | [X] **Insureds'** Duty to Defend | [ ] Insurer's Duty to Defend | [ ] Not Purchased |
| B. | Non-Indemnifiable Excess DIC Liability Coverage Part: | | |
| | [ ] **Insureds'** Duty to Defend | [ ] Insurer's Duty to Defend | [X] Not Purchased |
| C. | All Other **Liability Coverage Parts**: | | |
| | [X] **Insureds'** Duty to Defend | [ ] Insurer's Duty to Defend | [ ] Not Purchased |

28

*Id.* at p. 11.[2]

Pursuant to Endorsement No. 6, Zurich only has a duty to *advance* defense costs already paid and submitted to Zurich by the Insureds and such defense costs must be *covered* under the Policy.[3]  As explained below, Zurich likewise did not breach any duty to *advance* defense costs, because no "Lender Liability" coverage was purchased during the relevant period, rather claims involving "Lending Acts" were excluded.

_____

[2] The Policies' "Defense and Settlement" provision in the Policy likewise provides:

  1.  Insureds' Duty to Defend

  a.  With respect to any **Liability Coverage Part**, if, pursuant to Item 8 of the Declarations, it is the duty of the **Insureds** to defend **Claims**, then, subject to this Subsection VII.A. *it shall be the duty of the* ***Insureds*** *and not the duty of the Insurer to defend any* ***Claims*** *and the* ***Insureds*** *will choose defense counsel.*

FAC Ex. 4, p. 25 (emphasis added).

[3] The Policy provides as follows regarding advancing defense costs:

  C. DEFENSE COST ADVANCEMENT

  Under Subsections VII.A.1 and VII.A.2 above, solely with respect to the **Liability Coverage Parts**, the Insurer shall advance Defense Costs within ninety (90) days after receipt from the Insured of invoices for such **Defense Costs**, [which] comply with the Underwriter's Litigation Management Guidelines …. Any advancement of **Defense Costs** shall be repaid to the Insurer by the **Insureds** severally according to their respective interests if and to the extent the **Insureds** shall not be entitled under the terms and conditions of this policy to coverage for such **Defense Costs**.

FAC Ex. 4, pp. 68-69.

**D.** **Grandpoint Had Lender Liability Coverage but Opted Not to Extend It.  The Professional Liability Coverage That Grandpoint Purchased Excludes Coverage for Lending Acts.**

Through to the end date of the Policy (on July 30, 2018) the Policy contained multiple third-party "Liability Coverage Parts," including among others a "Lender Liability Coverage Part."  *Id.* at pp. 57-60.  Although the Lender Liability Coverage Part provided coverage for a "Wrongful Act … in connection with a Lending Act,"[4] Grandpoint (later purchased by Bancorp) *did not purchase* this coverage for the relevant period during which the underlying claims were first made.[5]  Instead, Grandpoint expressly ***declined*** to purchase or pay for "Lender Liability Coverage" for this period.

Specifically, pursuant to the "Optional Extended Reporting Period" provision in the Policy, Grandpoint was afforded the option to extend the "Lender Liability Coverage Part" and other "Liability Coverage Parts" when the Policy was set to

---

[4] This coverage provision stated:

> The Insurer shall pay on behalf of the **Insureds** all **Loss** for which the **Insureds** becomes legally obligated to pay on account of a **Claim** first made against the **Insureds** during the **Policy Period** or the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, for a **Wrongful Act** taking place before or during the **Policy Period** in connection with a **Lending Act**, subject to the applicable Limits of Liability set forth in the Declarations.

FAC Ex. 4, p. 58.

[5] Under a "claims made" policy, an insurer provides coverage for any loss resulting from claims *made* during the policy period or extended reporting period.  *World Health & Educ. Found. v. Carolina Cas. Ins. Co.*, 612 F. Supp. 2d 1089, 1094, 1094 n.1 (N.D. Cal. 2009).  This differs from an "occurrence" policy, where an insurer provides coverage for any loss resulting from acts that *occur* during the policy period.  *Id.* at 1094 n.1.

expire.  *Id.* at p. 23.  This provision provided Grandpoint with the right to purchase "extended reporting" of claims beyond the expiration of the Policy.[6]  Grandpoint exercised this right, and pursuant to Endorsement No. 16, Grandpoint purchased certain Extended Reporting Period ("ERP") coverages from Zurich, but *declined* to purchase further Lender Liability Coverage.  The Policy's "Effect Extended Reporting Period Endorsement" states:

> In accordance with Subsection IV.B.2 of the General Terms and Conditions,  the right has been exercised to purchase an Optional **Extended Reporting Period** for the period from 7/1/2018 to 7/1/2024, but only with respect to any **Wrongful Act** committed or allegedly committed before 7/1/2018.
>
> This Paragraph shall apply to the following **Liability Coverage Part(s):**
>
> Management Liability
>
> Public Company Securities Liability
>
> Professional Liability

*Id.* at p. 86.  Thus, while Grandpoint purchased ERP coverage for three Liability Coverage Parts for the period July 1, 2018 to July 1, 2024—management, public company securities, and professional liability—it opted *not* to purchase ERP coverage for the Lender Liability Coverage Part during the same period.

Bancorp purchased Grandpoint and brings this suit as the "corporate successor of Grandpoint."  FAC ¶ 17.  Acknowledging that the Zurich Policy did

---

[6] The Policy's Optional Extended Reporting Period provision states:

> If the Insurer or **Policyholder** terminates or refuses to renew this policy or one or more **Liability Coverage Parts** other than for nonpayment of premium, the **Insureds** shall have the right, upon payment of the additional premium set forth in Item 3.A of the Declarations, to an extension of the coverage granted by such **Liability Coverage Part(s)** for the **Extended Reporting Period** set forth in Item 3.B of the Declarations following the effective date of termination or nonrenewal, but only with respect to any **Claim** first made during the **Extended Reporting Period** for any **Wrongful Act** taking place prior to the effective date of such termination or nonrenewal.

*Id.* at p. 23.

not include Lender Liability coverage during the relevant period, Plaintiffs' First Amended Complaint instead asserts that the Professional Liability coverage part applies. *Id.* at ¶¶ 19-21. However, the "Professional Liability Coverage Part" does not provide coverage in connection with "Lending Acts." Moreover, the Professional Liability Coverage Part expressly excludes "Lending Acts" from the scope of this coverage. FAC Ex. 4, pp. 53, 73-74.

The Lending Act Exclusion as amended by Endorsement No. 9 provides as follows:

> III.  EXCLUSIONS
>
> > The Insurer shall not be liable under all Insuring Clauses of this Coverage Part for **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured**:
> >
> > * * *
> >
> > > P.  which constitutes a **Claim** for a **Wrongful Act**, as those terms are defined in the Lender Liability Coverage Part, in connection with a **Lending Act**

*Id.*

Accordingly, coverage in connection with "Lending Acts" expired when Grandpoint opted not to include it as part of its ERP coverage which commenced on July 1, 2018. Although it did purchase Professional Liability Coverage, that insuring agreement does not cover Lending Acts and expressly excludes Wrongful Acts in connection with a Lending Act. As discussed below, this bars Plaintiffs' claims against Zurich, and these claims should be dismissed.

## III.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Conservation Force v. Salazar,* 646 F.3d 1240, 1241-42 (9th Cir.

2011).  A complaint must have sufficient factual allegations to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard asks for "more than a sheer possibility that a defendant has acted unlawfully." *Id.*  The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 679.

Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Id.* at 1242 (citation and internal quotation marks omitted).  When considering a Rule 12(b)(6) motion, the court must "assume all factual allegations are true and construe them in the light most favorable to the plaintiff." *Cervantes v. U.S.*, 330 F.3d 1186, 1187 (9th Cir. 2003).  However, the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678.  Nor is the court required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

## B.   Interpretation of Insurance Contracts Under California Law

California law applies to this suit brought under the Policy issued to Grandpoint in California. *See* Cal. Civ. Code § 1646.  Under California law, the interpretation of insurance policies is a question of law. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).  "[T]he ordinary rules of contractual interpretation apply," the policy's terms must be given their "ordinary and popular sense," and if the policy language is "clear and explicit, it governs." *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999) (internal quotation marks omitted); *see* Cal. Civ. Code § 1638.

However, the California "duty to defend" standard, where an insurer owes a duty to defend "any suit which *potentially* seeks damages within the coverage of the policy" does not apply here—because as noted the Policy does not include a "duty

1  to defend" but instead provides only for the advancement of defense costs for

2  covered claims. *Impac Mortg. Holdings Inc. v. Houston Cas. Co.*, No. SACV 11-

3  1845-JST, 2013 WL 4045362, at *5-*6 (C.D. Cal. Feb. 26, 2013) (internal quotation

4  marks omitted) (citing *Jeff Tracy, Inc. v. U.S. Specialty Ins. Co.*, 636 F. Supp. 2d

5  995, 1003 (C.D. Cal. 2009)); *see also United Farm Workers of Am. v. Hudson Ins.*

6  *Co.*, No. 1:18-cv-0134, 2019 WL 1517568, at *13 (S.D. Cal. Apr. 8, 2019).

7  Accordingly, Zurich only has an obligation to advance defense costs for *actually*

8  (not potentially) covered claims. *United Farm*, 2019 WL 1517568, at *13.

9  Plaintiffs bear the burden to "establish that the underlying claims are within the

10 basic scope of coverage." *Impac Mortg.*, 2013 WL 4045362, at *6 (internal

11 quotation marks omitted).[7]

12 **IV.   ARGUMENT**

13        **A.    The Lending Act Exclusion Precludes Coverage for the Lawsuits.**

14        As set forth above, the Policy contains a Lending Act exclusion that bars

15 coverage for any "Claim for a Wrongful Act … *in connection with a Lending Act*."

16 The Policy defines "Lending Act" expansively, as follows:

17        (1) providing a loan, lease or extension of credit; (2) an agreement or

18        refusal to extend a loan, lease or extension of credit; (3) the collection,

19        foreclosure, repossession or restructuring of any loan, lease or extension

20        of credit by the **Company**; (4) the sale of credit life or disability insurance

21

22 _____

23 [7] Notably, Plaintiffs will not be able to establish that the Anderson Litigation and
   Beattie Litigation are within the basic scope of coverage since those suits contain *no*

24 *allegations whatsoever regarding the insured entity, Grandpoint*. Thus, in addition
   to the Lending Act Exclusion (discussed *infra*), coverage is unavailable for *at least*

25 the Anderson Litigation and Beattie Litigation for this separate reason. However, by
   combining all three Lawsuits into each of its claims, Plaintiffs have prevented

26 Zurich from moving to dismiss on this basis. *See Franklin v. Midwest Recovery*
   *Systems*, No. 8:18-cv-02085, 2020 WL 3213676, at *1 (C.D. Cal. Mar. 9, 2020)

27 ("Federal Rule of Civil Procedure 12(b)(6) does not provide a mechanism for

28 dismissing only a *portion* of a claim.") (emphasis added) (collecting cases).

incidental to the issuance of a loan; and (5) **Loan Servicing**.[8]  **Lending Act** shall include extensions of credit by the **Company** pursuant to a loan participation or syndication agreement.

FAC Ex. 4, p. 68.

Similarly, "in connection with" as used in the exclusion is construed as being "broad and unqualified" under California law, and encompasses both "direct" and "indirect" connections.  *See Jamison v. Certain Underwriters at Lloyd's*, 599 Fed. Appx. 720, 721 (9th Cir. 2015).  Thus, "'in connection with' … broadly links a factual situation with the event creating liability and connotes only a *minimal causal connection or incidental relationship*," requiring *less than* "but for" causation. *Adelman v. U.S. Specialty Ins. Co.*, No. 21-cv-02758-JST, 2021 WL 6427920, at *3 (N.D. Cal. Nov. 17, 2021), *appeal docketed*, No. 22-15048 (9th Cir. Jan. 12, 2022). Further, it is immaterial whether the injured party was never itself the subject of the insured's excluded conduct.  *United Talent Agency, LLC v. Markel Am. Ins. Co.*, No. 2:21-cv-00369-MCS-E, 2022 WL 599023, at *2-*3 (C.D. Cal. Jan. 26, 2022) (an exclusion for loss "in connection with the rendering or failure to render any professional services" applied even though the underlying claimant, the insured's competitor, never received professional services from the insured), *appeal docketed*, No. 22-55205 (9th Cir. Feb. 28, 2022).

---

[8] "Loan Servicing" means:

[W]hether for others or for loans, leases or extensions of credit made and retained by a **Company**, the servicing of an extension of credit including collecting loan payments, remitting principal and interest payments to investors, maintaining insurance, paying real estate taxes and hazard insurance premiums and following-up on delinquencies and managing foreclosures.

FAC Ex. 4, p. 68.

Here, the Receiver in the Hamstreet Litigation alleges that the Bank had a "lending relationship" with AEI between 2008 and 2015 and "provided credit to AEI Defendants that *allowed* AEI Defendants to operate and conceal a Ponzi scheme."  FAC Ex. 1, ¶¶ 7, 58-59.  The Receiver further alleges that the Bank: provided both credit and loans to AEI Defendants despite being aware of their precarious financial position; omitted industry standard appraisals for renewing credit; renewed AEI Defendants' credit without adequate appraisals; and that the Bank employees signed-off on renewing credit while noting serious questions about the Pools' revenue. *Id.* at ¶¶ 59, 62, 76.  Further, the Bank allegedly allowed AEI Defendants to "freely" use the line of credit and granted gratuitous extensions on maturing loans. *Id.* at ¶¶ 63, 79.  The Receiver also alleges that the Bank provided credit directly to AEI owner Ross Miles and details several specific instances of loan arrangements between the Bank and AEI Defendants. *Id.* at ¶ 80; *see generally id.* at ¶¶ 64-72.

According to the Receiver, the "Pacific Premier [line of credit] was an *essential part* of AEI Defendants' misuse of Pool assets" and "an *essential component* to the continuation of the Ponzi scheme." *Id.* at ¶¶ 63, 84.  Furthermore, "[w]ithout the Bank lines of credit to buffer periods when new investor money was not sufficient to make interest payments and distributions … AEI's insolvency would have been obvious." *Id.* at ¶ 32.  The Bank's alleged conduct providing credit and loans to AEI Defendants—and then extending AEI Defendants' credit and time to pay loans even while knowing about the Pools' financial problems— thus allowed AEI Defendants to operate the Pools as a Ponzi scheme, to deepen the Pools' debt, and to conceal the Pools' true financial condition—all of which harmed the Pools.

Likewise, the allegations against the Bank in the Anderson Litigation and Beattie Litigation track those in the Hamstreet Litigation:

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED
COMPLAINT (Fed. R. Civ. P. 12(b)(6))

1
2
3
4
5

> Pacific [Premier Bank] provided necessary financing to an insolvent American Equities through: (i) a "guidance line of credit" … (ii) a credit line to defendant Miles, personally, that was earmarked for American Equities business operations; and (iii) several loans and credit lines to American Equities affiliates.

6 FAC Ex. 2 (Anderson), ¶ 18; FAC Ex. 3 (Beattie), ¶ 18.

7        Plaintiffs in these actions further allege that the Bank supported AEI
8 Defendants' unlawful sales of securities and unlawful operation of a securities
9 business "[b]y providing credit advances of necessary funding secured by receivable
10 contracts taken from the [Pools]."  FAC Ex. 2, ¶ 65; FAC Ex. 3, ¶ 75.  The Second
11 Amended Complaints in the Anderson Litigation and Beattie Litigation summarize
12 the Bank's conduct as follows:

13
14
15
16
17
18

> The Pacific Premier lines of credit to American Equites … made possible the sales of … securities from no later than June 2008 to the collapse of the Funds in 2019.  Without those lines of credit, American Equities would not have the money necessary to continue its (false) illusion of solvency, safety, and prosperity; it would have not been able to continue selling securities.

19 *Id*.

20        In short, *all* of the allegations against the Bank in the Underlying Actions are
21 "in connection with" numerous "Lending Acts" by the Bank for the benefit of AEI
22 Defendants.  According to the Underlying Actions, the conduct of the Bank in
23 providing credit and loans to AEI Defendants was "essential" to the operation of the
24 Ponzi Scheme.  Thus, the Bank's Lending Acts undoubtedly had *at least* a "minimal
25 causal connection or incidental relationship" to its alleged "Wrongful Acts."
26 Indeed, although not required for the Lending Act Exclusion to apply, the
27 Underlying Actions effectively allege that the Bank's Lending Acts were the "but

28

for" cause of the claims made against the Bank.  For this reason, the Lending Act Exclusion plainly and expressly applies to bar coverage for the Underlying Actions.

Authorities outside California also support applying the exclusion here.  *See Bank of Camilla v. St. Paul Mercury Ins. Co.*, 939 F. Supp. 2d 1299 (M.D. Ga. 2013).  *Bank of Camilla* similarly involved a bank that allegedly knew about and propped up a Ponzi Scheme perpetrated by its customer.  Underlying plaintiffs alleged that the bank conspired with and aided and abetted its customer, and that it participated in concealing the scheme by not returning checks drawn on insufficient funds (amongst other things).  Granting judgment on the pleadings for the bank's insurer, the court held that a prior/pending exclusion, which barred coverage for a "Lending Act" before a certain date, applied because the bank's conduct was a "Lending Act"—defined as "any error … omission … breach of duty … in connection with or relating to" various credit and loan activities.  *Id.* at 1308-1309. The court reasoned that the bank's "alleged concealment of the Ponzi scheme *in connection with* the extensions of credit … fall[s] under the definition of a 'Lending Act.'"  *Id.* at 1309 (emphasis added); *see also RHBT Fin. Corp. v. St. Paul Mercury Ins. Co.*, No. 0:03-3295-1, 2004 WL 5806112, at *2-*4 (D.S.C. Aug. 12, 2004) (an exclusion for "any Wrongful Act *in connection with* an actual or alleged negligent act, error, omission … involving any extension of credit" barred coverage when the insured bank negligently supervised employees resulting in "problem loans" with insufficient documentation or covered-up non-payments).

Plaintiffs' suggestion that they can isolate certain allegations apart from Lending Acts to avoid the operation of the Lending Acts Exclusion is without merit. FAC at ¶ 36.  There is no requirement that every single allegation against the Bank must expressly refer to a lending activity.  As explained above, the Exclusion's causal requirement is only that the allegations against the Bank are "in connection with" a Lending Act.  As outlined above, *all* of the allegations against the Bank stem from its lending relationship with AEI, including the information it learned

1   during that relationship and the fact that the relationship continued when the Bank

2   allegedly learned of irregularities or improprieties in AEI's business operations.

3          Nevertheless, Plaintiffs argue that this Court should view certain underlying

4   allegations in isolation (ignoring that everything occurred in the context of the

5   lending relationship).  Based on the fiction of viewing certain allegations in

6   isolation, Plaintiffs further argue that they can then "allocate" between covered and

7   uncovered defense costs.  FAC at ¶ 37.  But allocation depends on the existence of

8   allegations against the Bank of "Wrongful Acts" that *do not* have a "minimal causal

9   connection or incidental relationship" with "Lending Acts"—and no such

10  allegations exist here.

11         Plaintiffs point to allegations against the Bank in the Hamstreet Litigation

12  which they assert hinge on "awareness," "allowing," or failure to "detect" or

13  "report" the conduct *of AEI Defendants.  Id.* at ¶ 11.  But these allegations do not

14  identify any acts or omissions by the Bank which would have occurred *but for* the

15  lending relationship between the Bank and AEI.  The information which the Bank is

16  alleged to be aware of is information provided to it in the context of its lending

17  activities, just as allegations against the Bank for *continuing* to lend to AEI directly

18  involve its lending activities.  None of this alleged conduct would exist *isolated*

19  *from or independent of* the Bank's lending relationship with AEI.

20         Plaintiffs also assert that "the Receiver has denied that the Pools' claims

21  against the Bank are ones 'which are asserted exclusively in connection with credit

22  advances made by the Bank to managers of the Pools.'"  FAC at ¶ 11.  However,

23  Plaintiffs provide no exhibit or other context in support of this bald assertion, and in

24  any event, it makes no difference.  The Second Amended Complaint in the

25  Hamstreet Litigation is clear that the Receiver's allegations encompass not only

26

27

28

"credit advances" but also traditional loans.[9]  Accordingly, it is immaterial that the Receiver denied its claims are "exclusively in connection with credit advances." Both extensions of credit and other loans fall equally within excluded "Lending Acts," which include "providing a loan … or extension of credit."  FAC Ex. 4, p. 68.

The Underlying Actions allege that the credit provided to AEI Defendants was necessary to the very existence of the Ponzi Scheme, its concealment, and the Pools' initial and deepening insolvency—without which the underlying plaintiffs would not have suffered damages in the first place.  This more than meets the broadly construed causal nexus of the Lending Acts Exclusion, which only requires that the claim be "in connection with a Lending Act."   Therefore, the allegations in the Lawsuits fall squarely within the Lending Act Exclusion, which precludes coverage entirely.

## B.    The Breach of Contract and Declaratory Relief Claims Fail Because There Is No Coverage Under the Policy.

To plead a claim for breach of contract, Plaintiffs must allege facts that support a reasonable inference that their alleged loss is covered under the Policy. "[A]bsent an actual withholding of benefits due, there is no breach of contract." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151 n.10 (Ct. App. 1990) (internal quotation marks omitted).  However, the allegations in the First Amended Complaint show that Plaintiffs are not entitled to coverage under the Policy because the Lending Act Exclusion applies.  Therefore, the first claim for breach of contract must be dismissed.

Because it depends on the existence of coverage under the Policy, Plaintiffs' third claim for declaratory relief also fails.  *See Poe v. Northwestern Mut. Life Ins.*

---

[9] *See* FAC Ex. 1, ¶¶ 64 ("Advances made by Pacific Premier under the Pacific Premier [line of credit] were secured by real estate paper that belonged to the Pools. The proceeds from those advances were used to pay down AEI's *other troubled loans with Pacific Premier*."), 68 ("[I]n 2010, Pacific Premier agreed to make *two new loans* to AEI and Miles. Each loan was for approximately $1 million….") (emphasis added).

1   *Co.*, No. CV 21-02065, 2022 WL 2046190, at *3 (C.D. Cal. Apr. 20, 2022)

2   (dismissing a declaratory relief claim that was duplicative and derivative of other

3   claims); *see, e.g., World Health*, 612 F. Supp. 2d 1089, 1093-1096, 1099

4   (dismissing declaratory relief, breach of contract, and bad faith claims without leave

5   to amend, based on the lack of coverage).

6       **C.**    **There Can Be No "Bad Faith" Because There Is No Coverage.**

7       In order to state a claim for "bad faith," a plaintiff must establish in the first

8   instance that policy benefits are due under the contract.  *See Love*, 221 Cal. App. 3d

9   at 1151-1152 (benefits being due under the policy is a "threshold requirement");

10   *Waller*, 11 Cal. 4th at 36 (a bad faith claim "cannot be maintained unless policy

11   benefits are due") (internal quotation marks omitted); *see, e.g., Brown v. Mid-*

12   *Century Ins. Co.*, 215 Cal. App. 4th 841, 858 (Ct. App. 2013) ("Because the policy

13   did not cover the [insureds'] claims … the [insureds] do not have a claim for [bad

14   faith].")  Additionally, a plaintiff must establish that benefits were improperly or

15   unreasonably withheld.  *Intergulf Dev. LLC v. Super. Ct.*, 183 Cal. App. 4th 16, 20

16   (Ct. App. 2010); *Love*, 221 Cal. App. 3d at 1151.

17       Here, the First Amended Complaint fails to allege that policy benefits were

18   withheld in the first instance.  On the contrary, the First Amended Complaint seeks

19   coverage for underlying lawsuits that are plainly excluded under the Policy.  Absent

20   a determination that policy benefits were ever owed, let alone any indication that

21   they were improperly or unreasonably withheld, there can be no bad faith.

22   Therefore, Plaintiffs' second claim for bad faith must also be dismissed.

23       **D.**    **The First Amended Complaint Should Be Dismissed with Prejudice**

24               **Because Amendment Would Be Futile.**

25       Plaintiffs' allegations do not support a plausible inference of coverage, and

26   therefore, the First Amended Complaint fails on its face.  Further, the First

27   Amended Complaint should be dismissed without leave to amend because

28   amendment would be futile.  Plaintiffs cannot state additional facts to bring their

1    alleged loss within the coverage of the Policy.  *See, e.g., Pappy's Barber Shops, Inc.*

2    *v. Farmers Grp., Inc.*, 491 F. Supp. 3d 738 (S.D. Cal. 2020) (citing

3    *AmeriSourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006)).

4         The gravamen of the Lawsuits for which Plaintiffs seek coverage is clear:

5    underlying plaintiffs uniformly allege that the Bank's ongoing provision of *credit*

6    and *loans* to the AEI Defendants (i.e. "Lending Acts") was essential to the operation

7    and concealment of the Ponzi scheme from which their damages flow.  Given that

8    the Lending Acts Exclusion requires only that the Bank's conduct is "in connection

9    with" Lending Acts, there is no prospect of Plaintiffs reframing the Lawsuits such

10   that they would not fall within the Lending Act Exclusion.  Thus, permitting

11   Plaintiffs to amend their First Amended Complaint would be a futile exercise.

12   **V.    CONCLUSION**

13        For the foregoing reasons, Zurich respectfully requests that the Court dismiss

14   with prejudice Plaintiffs' First Amended Complaint in its entirety as to Zurich,

15   under Federal Rule of Civil Procedure 12(b)(6).

16

17   Dated:  July 29, 2022                CLYDE & CO US LLP

18
                                         By:    */s/ Susan Koehler Sullivan*
19                                       _____
                                         SUSAN KOEHLER SULLIVAN
20                                       PATRICK R. EMERSON
                                         Attorneys for Defendant
21                                       ZURICH AMERICAN INSURANCE
22                                       COMPANY

23

24

25

26

27

28